UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TONY ANTHONY DAY,<br><br>Defendant. | 4:25-CR-40134-RAL<br><br><br>OPINION AND ORDER ON REPORT AND RECOMMENDATION |

Police officers discovered a gun in Defendant Tony Day's apartment after he consented to a search. Day moved to suppress the evidence, arguing that an illegal protective sweep preceded the search and that he did not voluntarily consent to it. The magistrate judge recommended denying Day's motion and Day now objects. For the reasons explained below, this Court wants to hear oral argument from the parties about whether any exceptions to the exclusionary rule may apply.

## I.    Facts

Sioux Falls Police received a call about a weapons violation on the evening of June 19, 2025. Doc. 29 at 6. They located the reporting party and his girlfriend outside an apartment complex at 1600 South Rock Creek Drive. Id. at 6–7. The girlfriend said she had been walking up the stairs inside the 1600 complex when an African American man she knew as "Tony," or "Fifty," pulled out a gun and called her a derogatory name. Id. at 10; Def. Ex. B, Lacina Clip. The girlfriend ran past "Tony" to the parking lot where the reporting party was waiting in his car. Doc.

1

29 at 7, 10. The reporting party said he saw a man he knew as "Fifty" follow his girlfriend out of the complex with a gun in his hand. Id. at 7–8. The reporting party stated that he exited his car and that "Fifty" assumed a confrontational posture toward him while holding the gun at his waist in front of him. Id. at 8. The reporting party and his girlfriend described the gun as a .32 or .22 caliber black, snub-nosed revolver. Id. at 15. "Tony," or "Fifty," left when the reporting party called the police. Id. at 8.

The reporting party and his girlfriend said that "Tony" lived on the second floor of an apartment complex across the street. Id. at 9–10; Def. Ex. B, Lacina Clip. An officer recognized the description of "Tony" and identified him as Tony Day. Doc. 29 at 11; Def. Ex. B, Lacina Clip. Police had issued a BOLO ("be on the lookout") for Day's arrest for a robbery that occurred five days earlier.[1] Doc. 29 at 11–14. The BOLO said that Day and a female accomplice had robbed a woman of $80 after Day punched her until she provided her Cash App pin. Id. at 12–13. Police records confirmed that Day lived in an apartment complex across the street from where he had allegedly brandished the gun.[2] Id. at 11, 26.

Sioux Falls Police Officer Austin Koester[3] used a knife to unlock the entrance to the apartment complex where Day lived. Id. at 42; Gov. Ex. 1 at 3:39–43. Officers proceeded to Day's second floor apartment and knocked loudly on his door, announcing themselves as the police. Gov. Ex. 1 at 6:53–8:00. Though the officers knocked at least three more times, it took

---

[1]As the magistrate judge recognized, the BOLO did not include the date of the alleged robbery. Sergeant Brady Fox testified that the robbery occurred five days before the incident on June 19, 2025. Doc. 29 at 63, 70.

[2]Day's objections include a section of "Additional Relevant Facts" in which he discusses the police questioning another person named Jonathan Clark who possibly matched the suspect description before they entered Day's apartment complex. Doc. 38 at 2–4. Day has not made clear why the officers' investigation of another potential suspect is relevant to his motion to suppress.

[3]Officer Koester is now a detective with the Sioux Falls Police Department but was a patrol officer in June 2025. Doc. 29 at 24–25.

Day about 90 seconds to answer his door. Id.; Def. Ex. B, Hagberg Clip 1; Doc. 29 at 28–29; 62. Day ignored an officer's command to put his hands up, instead turning and locking his apartment door. Def. Ex. B, Hagberg Clip 1. Officers handcuffed Day and placed him in the apartment stairwell roughly ten feet from his apartment door. Id.; Doc. 29 at 29–30. A door separated the stairwell where Day sat from the apartment hallway. Doc. 29 at 30, 45.    One of the officers told Day that they would need to read him his Miranda[4] rights if he wanted to talk about what happened. Gov. Ex. 1 at 10:20–28. Officers also asked Day whether they could check his apartment to see whether anyone else was inside, but Day refused. Id. at 10:45–11:00; Gov. Ex. 2 at 16:52–17:15. The police told Day he was being detained but did not tell him he was under arrest or that he would be arrested. Def. Ex. B, Hagberg Clip 1; Doc. 29 at 82–83. The officers testified at the hearing that Day was under arrest while in the hallway because of the BOLO. Doc. 29 at 70, 82–83, 87; see also id. at 38.

Sergeant Brady Fox decided to conduct a protective sweep of Day's apartment to ensure there was no one else inside who could access the firearm Day had allegedly brandished. Doc. 29 at 63–64, 88–89. Sergeant Fox testified that he believed the search was necessary given that the firearm was unaccounted for, Day had an active BOLO for a robbery five[5] days earlier, and officers would potentially need to "hold" the apartment for a long time to secure a search warrant.[6] Id. at

---

[4]Miranda v. Arizona, 384 U.S. 436 (1966).

[5]Sergeant Fox initially testified that the robbery occurred four days earlier, Doc. 29 at 63, but later testified that it occurred on June 14, which was five days before Day allegedly brandished the firearm, id. at 70.

[6]Officer Koester can be overheard on body camera footage telling Day they were going to search his apartment to make sure no one was hurt inside and that police can do a safety sweep if they were going to write a search warrant to ensure there was no one in the apartment ruining evidence. Gov. Ex. 1 at 15:52–16:12. Although Day notes these statements in his objections, Doc. 38 at 6, Officer Koester's "subjective considerations" are "immaterial" to whether the officers had reasonable suspicion to conduct a protective sweep. United States v. Pile, 820 F.3d 314, 316–17 (8th Cir. 2016) (per curiam).

63–64, 88–89, 95–96. Sergeant Fox also cited Day's delay in answering the door, agreeing with the prosecutor this could have allowed someone in the apartment to hide.[7] Id. at 63–64.

Sergeant Fox unlocked the door with Day's keys and led three other officers into the apartment to conduct the protective sweep. Gov. Ex. 2 at 22:05–55; Doc. 29 at 64. The officers checked the closets, rooms, and around and behind the furniture, confining the sweep to areas where someone could be hiding. Doc. 29 at 64–65; Gov. Ex. 2 at 22:45–25:23. The sweep lasted about two-and-a-half minutes, and the officers did not seize any evidence during it. Gov. Ex. 2 at 22:30–25:40; Doc. 29 at 65.

While the officers performed the protective sweep, Day told Officer Koester that he had a toy cap gun under his bed. Gov. Ex. 1 at 16:45–17:28; Doc. 29 at 31. Officer Koester asked if the officers could retrieve the toy gun, and Day said multiple times that they could. Doc. 29 at 31; Gov. Ex. 1 at 17:00–17:11, 18:40–45. As the officers performing the sweep exited Day's apartment, Officer Koester told them that Day said they could retrieve the toy cap gun underneath his bed. Gov. Ex 1 at 19:17–50. Day told the officers where the toy gun was and said that he had two machetes in the apartment but no other guns. Id. at 19:17–50. The officers reentered Day's apartment and seized the toy gun and a pair of blue jeans they saw in plain view. Doc. 29 at 65–67; Gov.'s Ex. 2 at 26:00–29:00. The toy gun was not a black, snub-nosed revolver like the reporting party and his girlfriend described, but the blue jeans were consistent with what these witnesses said Day was wearing when he brandished the gun. Doc. 29 at 66–68.

---

[7]Video clips from the officers' body cameras show the officers discussing entering Day's apartment before they conducted the protective sweep. At one point Sergeant Fox says "No, we can't," in response to another officer saying, "I've got the keys." Def.'s Ex. B, Fox Clip 1; Gov. Ex. 2 at 17:38–17:47. A short while later Sergeant Fox said, "It'd be nice to know if we need a safety sweep." Def.'s Ex. B, Fox Clip 2; Gov. Ex. 2 at 19:05–10.

Once the officers finished retrieving the toy gun and jeans, Officer Koester asked Day for permission to search the apartment. Gov.'s Ex. 1 at 23:35–24:05; Gov.'s Ex. 2 at 29:55–30:20. They had the following exchange:

> Officer Koester: Can they search your apartment?
> Day: (inaudible)
> Officer Koester: They want to look for any evidence of a crime, so if you're innocent and there's no evidence in there obviously it's gonna help your, your case, right? If they find evidence of the crime then—
> Day: I just woke up, man.
> Officer Koester: Okay. Can they—can they just go through and make sure there's nothing that would link you to what happened today?
> Day: I would rather be there.
> Officer Koester: You would rather be there? Okay. Well, we can't just have you just sitting in there watching, so. You can—you can stop this—you can tell—you can say
> Day: Did you find the, um, uh, uh, the cap gun?
> Officer Koester: Yeah, we did.
> Day: Okay, then that's it. And the machetes are on the opposite side of my bed.
> Officer Koester: Okay. Can we just double check? Like trust but verify, right? Like I don't know you. I don't know if what you're telling me is correct, right?
> Day: I don't want people just creeping around my crib.
> Officer Koester: Okay. So that's a no?
> Day: I really would, would rather not.
> Officer Koester: Okay.

Gov.'s Ex. 1 at 23:55–24:55. Immediately after this exchange, Day overheard Sergeant Fox in the hallway telling officers to secure the apartment and items they had seized. Gov. Ex. 2 at 31:05–25; Gov.'s Ex. 1 at 24:50–57; Doc. 29 at 34–35. This prompted further discussion:

> Day: Whoa, whoa. Wait, wait, wait. Hold on. What did he say?
> Officer Koester: We're going to call a detective so they can write a search warrant so we can search your entire apartment. Is there anything we're gonna find in there?
> Day: Nah.

Gov.'s Ex. 1 at 24:55–25:10.  When Sergeant Fox told the officers to move Day to a patrol car,

Day, unprompted, said:

> Day: Go ahead and search.
> Officer Koester: Let's do it.
> Day: (inaudible) What'd he say?
> Officer Koester: You want us to search it?
> Day: I mean, if you're going to uh, just make a mockery of it, might as well.

Id. at 25:09–25; Gov. Ex. 2 at 31:27–31:34.

Officer Koester told Sergeant Fox that Day was changing his mind about the search, and

Day and Officer Koester then continued to discuss Day's consent:

> Officer Koester: So he can search—we can search your apartment for any evidence?
> Day: Man, I don't—I don't—I would rather be—
> Officer Koester: It's a yes or no, right? You just said go ahead and search and now you're—
> Day: I mean, yeah, go ahead.
> Officer Koester: Go ahead? Go ahead and what?
> Day: Yes.
> Officer Koester: We can search your apartment?
> Day: Yes.
> Officer Koester: Okay.
> Day: Uh, I really don't want—
> Officer Koester: Just so you—hey—you can refuse consent at any time. So if you want to stop the search you can just let me know, okay?
> Day: I really don't want to be wearing these (referring to handcuffs). (Inaudible).
> Officer Koester: I know, but—but you're being detained right now. I can't take them off right now, okay?
> Day: I mean, no, I'm not saying—
> Officer Koester: The allegations—
> Day: The process.  The process, if it's quick, then fine.
> Officer Koester: Okay. Yeah. You can revoke the consent at any time.  So if—
> Day: I don't wanna revoke, I want to get out of these handcuffs.
> Officer Koester: Okay, I gotcha.

6

Gov. Ex. 1 at 25:25–26:15.[8]

The officers searched Day's apartment and found some "methamphetamine-related paraphernalia" and a black revolver in the ceiling tiles of the bathroom. Gov. Ex. 2 at 41:00–42:02; Doc. 29 at 36, 71. The revolver matched the description given by the reporting party and his girlfriend. Doc. 29 at 36–37, 71. A federal grand jury charged Day with possession of a firearm by a prohibited person. Doc. 1.

## II.    Analysis

### A. Standard for Reviewing Report & Recommendation

This Court reviews a report and recommendation under the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." However, "[i]n the absence of an objection, the district court is not required 'to give any more consideration to the magistrate's report than the court considers appropriate.'" United States v. Murillo-Figueroa, 862 F. Supp. 2d 863, 866 (N.D. Iowa 2012) (quoting Thomas v. Arn, 474 U.S. 140, 150 (1985)).

The magistrate judge recommended denying the motion to suppress, finding that the protective sweep exception to the warrant requirement applied to the first search of Day's apartment, that Day voluntarily consented to the second search for the limited purpose of retrieving the toy gun,[9] and that Day voluntarily consented to the third search during which officers recovered the black revolver. Doc. 30 at 9–20. Day now objects, arguing that the officers lacked reasonable

---

[8]Body camera footage from Sergeant Fox shows that the police entered Day's apartment for the consent search right after Day said "Yes" the first time, and just before Officer Koester said Day could refuse consent at any time. See Gov. Ex. 2 at 31:42–32:10; Gov. Ex. 1 at 25:30–26:15.
[9]The magistrate judge noted that Day was unclear about whether he was arguing that his consent to the second search was involuntary. Doc. 30 at 14.

suspicion to conduct a protective sweep and that his consent to the third search was involuntary. Doc. 38. Day does not object to the magistrate judge's finding that the second search was constitutional, however. Doc. 38 at 11–12.

### B. Protective Sweep

The Supreme Court in Maryland v. Buie, 494 U.S. 325, 327 (1990), established that police officers may conduct a "protective sweep" of a home while making an arrest without violating the Fourth Amendment. "A 'protective sweep,'" Buie explains, "is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Id. These protective sweeps are justified, however, only when police "possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." Id. (cleaned up and internal citations omitted). Police thus must have reasonable suspicion that a dangerous individual is inside the residence and cannot perform protective sweeps just "for weapons or contraband." United States v. Alatorre, 863 F.3d 810, 813 (8th Cir. 2017) (citation omitted). Because the arrest of a suspect doesn't always remove the threat from other individuals potentially in the home, the Eighth Circuit and other federal appellate courts have upheld protective sweeps of a residence even after an arrest is made outside the residence. Id. at 814–15 (finding reasonable protective sweep of home conducted after officers had arrested suspect at his front door and secured him on his porch).

This Court is skeptical that the Government met its burden to show that the police had reasonable suspicion to believe a dangerous individual was in Day's apartment. It is true that the officers' plan to hold Day's apartment until they could secure a warrant made them more vulnerable to an attack from inside than if they had merely arrested Day and immediately

8

transported him to jail. See id. at 815 (noting that officers dealing with arrested suspect and his girlfriend on front porch remained "vulnerable to attack from someone inside the residence"). The officers also had a reasonable belief that there was a gun inside Day's apartment, knew from the BOLO that Day and an accomplice had allegedly robbed someone five days earlier, and said they were concerned that Day's delay in answering the door might have allowed an accomplice to hide. These factors tend to support the officers' decision to conduct a protective sweep. See United States v. Thompson, 6 F.4th 789, 793 (8th Cir. 2021) (finding that the potential presence of guns in the house anyone remaining inside could use against the police supported officers' decision to perform protective sweep); Alatorre, 863 F.3d at 815 (citing to delay in answering the door, along with the "audible movements and behaviors" of those inside the home); United States v. Davis, 471 F.3d 938, 945 (8th Cir. 2006) (stressing—along with multiple other facts showing reasonable suspicion—that suspect "associated with dangerous and violent persons"); United States v. Brown, 217 F.3d 605, 607–08 (8th Cir. 2000) (upholding protective sweep of house where suspect paused when asked whether anyone else was in the house and officers knew that suspect and his roommate had been arrested five months earlier with two guns).

But the police in cases where the Eighth Circuit has upheld protective sweeps had more articulable facts suggesting someone else was inside the residence than the officers had here. In Alatorre, for instance, the officers overheard quiet conversations coming from the house and heard and saw movements in the house consistent with multiple people being inside. 863 F.3d at 812, 814–15. Similarly, the officers in Thompson waited six to eight minutes for someone to answer the door, saw window blinds move and heard people walking and moving things inside, and could not locate the woman to whom they believed the house belonged. 6 F.4th at 791, 793. They also received an "odd, ambiguous answer" when they asked whether anyone else was in the house. Id.

9

at 793. Likewise, in Brown, the police knew that the suspect and his roommate had been arrested five months earlier in a vehicle where two guns were found and the suspect paused before answering whether anyone else was in his home. 217 F.3d at 607. The officers at Day's apartment did not report any facts like those Alatorre, Thompson, or Brown. Rather, Officer Koester testified that he did not hear any noise coming from Day's apartment, Doc. 29 at 46, and Sergeant Fox similarly denied hearing any "disturbance" therein, Id. at 87. The Government also failed to offer any evidence suggesting that Day's accomplice mentioned in the BOLO would be inside the apartment or that anyone was with Day when he allegedly brandished the firearm. The mere possibility someone else is inside a residence is not enough to justify a protective sweep. United States v. Carter, 360 F.3d 1235, 1242–43 (10th Cir. 2004).

But this Court's skepticism about the protective sweep doesn't necessarily mean the gun found in Day's apartment must be suppressed. The exclusionary rule is the "principal judicial remedy" for Fourth Amendment violations. Utah v. Strieff, 579 U.S. 232, 237 (2016). It requires courts to exclude evidence seized "as a direct result of an illegal search" as well as "the fruit of the poisonous tree," meaning evidence discovered later but derived from an illegal search. Id. at 237 (cleaned up and citation omitted). The exclusionary rule "is not an individual right," however, and does not apply to every Fourth Amendment violation. Herring v. United States, 555 U.S. 135, 141 (2009). Rather, the impetus for the rule—at least for the last 60 years or so—has been to deter future police misconduct. United States v. Calandra, 414 U.S. 338, 347–48 (1974); Herring, 555 U.S. at 140–41. The exclusionary rule is thus limited to cases where it results in "appreciable deterrence," Arizona v. Evans, 514 U.S. 1, 11 (1995) (citation omitted), and where these deterrent benefits outweigh the rule's "substantial social costs," Strieff, 579 U.S. at 237 (citation omitted).

10

The Supreme Court has recognized several situations where the exclusionary rule's deterrent benefits do not outweigh its costs, the relevant situation here being the "attenuation doctrine." Strieff, 579 U.S. at 237–38. Evidence is admissible under the attenuation doctrine when the causal "connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." Id. at 238. A suspect's consent to search can break the causal chain between the original illegality and discovery of the evidence. United States v. Whisenton, 765 F.3d 938, 941 (8th Cir. 2014). "When an illegal entry precedes a defendant's grant of consent to search, the Government must show (1) that the defendant's consent was voluntary and (2) that the consent was an independent act of the defendant's free will that purged the taint of the Fourth Amendment violation." Id. (cleaned up and citation omitted).

The Government did not address the attenuation doctrine in its arguments to the magistrate judge, though it did contend that the protective sweep did not produce any evidence and thus had minimal relevance to whether Day's consent was voluntary. Doc. 23 at 11, 16. This Court wants to hear from both parties at oral argument on whether the attenuation doctrine or any other exception to the exclusionary rule should apply here. Accordingly, it is

ORDERED that the parties cooperate with chambers to set oral argument.

DATED this 19th day of March, 2026.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

11