UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> TONY ANTHONY DAY, <br><br> Defendant. | 4:25-CR-40134-RAL <br><br><br> OPINION AND ORDER DENYING MOTION TO SUPPRESS |

Police officers discovered a gun in Defendant Tony Day's apartment on their third entrance into the apartment after he consented to a search. Day moved to suppress the evidence, arguing that an illegal protective sweep preceded the third search and that he did not voluntarily consent to it. The magistrate judge recommended denying Day's motion and Day objected. This Court heard oral argument from the parties about whether any exception to the exclusionary rule may apply. Because Day's voluntary consent to the search was sufficient to purge the taint of the improper protective sweep, this Court denies Day's motion to suppress.

I.      Facts

Sioux Falls Police received a call about a weapons violation on the evening of June 19, 2025. Doc. 29 at 6. They located the reporting party and his girlfriend outside an apartment complex at 1600 South Rock Creek Drive. Id. at 6–7. The girlfriend said she had been walking up the stairs inside the 1600 complex when an African American man she knew as "Tony," or "Fifty," pulled out a gun and called her a derogatory name. Id. at 10; Def. Ex. B, Lacina Clip. The

1

girlfriend ran past "Tony" to the parking lot where the reporting party was waiting in his car. Doc. 29 at 7, 10. The reporting party said he saw a man he knew as "Fifty" follow his girlfriend out of the complex with a gun in his hand. Id. at 7–8. The reporting party stated that he exited his car and that "Fifty" assumed a confrontational posture toward him while holding the gun at his waist in front of him. Id. at 8. The reporting party and his girlfriend described the gun as a .32 or .22 caliber black, snub-nosed revolver. Id. at 15. "Tony," or "Fifty," left when the reporting party called the police. Id. at 8.

The reporting party and his girlfriend said that "Tony" lived on the second floor of an apartment complex across the street. Id. at 9–10; Def. Ex. B, Lacina Clip. The girlfriend gave a description of "Tony"—African American bald man in his fifties—that describes Day. Def. Ex. F. An officer recognized that description of "Tony" and identified him as Tony Day. Doc. 29 at 11; Def. Ex. B, Lacina Clip. Police had issued a BOLO ("be on the lookout") for Day's arrest for a robbery that occurred five days earlier.[1] Doc. 29 at 11–14. The BOLO said that Day and a female accomplice had robbed a woman of $80 after Day punched her until she provided her Cash App pin. Id. at 12–13. Police records confirmed that Day lived in an apartment complex across the street from where he had allegedly brandished the gun.[2] Id. at 11, 26.

---

[1]As the magistrate judge recognized, the BOLO did not include the date of the alleged robbery. Sergeant Brady Fox testified that the robbery occurred five days before the incident on June 19, 2025. Doc. 29 at 63, 70.

[2]Day's objections include a section of "Additional Relevant Facts" in which he discusses the police questioning another person named Jonathan Clark who possibly matched the suspect description before they entered Day's apartment complex. Doc. 38 at 2–4. Day explained at oral argument that this evidence is relevant to whether the inevitable discovery doctrine applies. This decision turns on the attenuation doctrine rather than the inevitable discovery doctrine.

Sioux Falls Police Officer Austin Koester[3] used a knife to unlock the entrance to the apartment complex where Day lived. Id. at 42; Gov. Ex. 1 at 3:39–43. Officers proceeded to Day's second floor apartment and knocked loudly on his door, announcing themselves as the police. Gov. Ex. 1 at 6:53–8:00. Though the officers knocked at least three more times, it took Day about 90 seconds to answer his door. Id.; Def. Ex. B, Hagberg Clip 1; Doc. 29 at 28–29; 62. Day ignored an officer's command to put his hands up, instead turning and locking his apartment door. Def. Ex. B, Hagberg Clip 1.

Officers handcuffed Day and placed him in the apartment stairwell roughly ten feet from his apartment door. Id.; Doc. 29 at 29–30. A door separated the stairwell where Day sat from the apartment hallway, though the door was periodically open as officers entered and left the hallway. Doc. 29 at 30, 45.    One of the officers told Day that they would need to read him his Miranda[4] rights if he wanted to talk about what happened. Gov. Ex. 1 at 10:20–28. Officers also asked Day whether they could check his apartment to see whether anyone else was inside, but Day refused. Id. at 10:45–11:00; Gov. Ex. 2 at 16:52–17:15. The police told Day he was being detained but did not tell him he was under arrest or that he would be arrested. Def. Ex. B, Hagberg Clip 1; Doc. 29 at 82–83. The officers testified at the hearing that Day was under arrest while in the hallway because of the BOLO. Doc. 29 at 70, 82–83, 87; see also id. at 38.

Sergeant Brady Fox, after initial uncertainty about the propriety of doing so,[5] decided to conduct a protective sweep of Day's apartment to ensure there was no one else inside who could

---

[3]Officer Koester is now a detective with the Sioux Falls Police Department but was a patrol officer in June 2025. Doc. 29 at 24–25.

[4]Miranda v. Arizona, 384 U.S. 436 (1966).

[5]Video clips from the officers' body cameras show the officers discussing entering Day's apartment before they conducted the protective sweep. At one point Sergeant Fox says "No, we can't," in response to another officer saying, "I've got the keys." Def. Ex. B, Fox Clip 1; Gov. Ex.

access the firearm Day had allegedly brandished. Doc. 29 at 63–64, 88–89. Sergeant Fox testified that he believed the search was necessary given that the firearm was unaccounted for, Day had an active BOLO for a robbery five[6] days earlier, and officers would potentially need to "hold" the apartment for a long time to secure a search warrant.[7] Id. at 63–64, 88–89, 95–96. Sergeant Fox also cited Day's delay in answering the door, agreeing with the prosecutor this could have allowed someone in the apartment to hide. Id. at 63–64.

Sergeant Fox unlocked the door with keys taken from Day and led three other officers into the apartment to conduct the protective sweep. Gov. Ex. 2 at 22:05–55; Doc. 29 at 64. The officers checked the closets, rooms, and around and behind the furniture, confining the sweep to areas where someone could be hiding. Doc. 29 at 64–65; Gov. Ex. 2 at 22:45–25:23. The sweep lasted about two-and-a-half minutes, and the officers did not seize any evidence during it. Gov. Ex. 2 at 22:30–25:40; Doc. 29 at 65.

While the officers performed the protective sweep, Day told Officer Koester that he had a toy cap gun under his bed. Gov. Ex. 1 at 16:45–17:28; Doc. 29 at 31. Officer Koester asked if the officers could retrieve the toy gun, and Day said multiple times that they could. Doc. 29 at 31; Gov. Ex. 1 at 17:00–17:11, 18:40–45. As the officers performing the sweep exited Day's

_____

2 at 17:38–17:47. A short while later Sergeant Fox said, "It'd be nice to know if we need a safety sweep." Def. Ex. B, Fox Clip 2; Gov. Ex. 2 at 19:05–10.

[6]Sergeant Fox initially testified that the robbery occurred four days earlier, Doc. 29 at 63, but later testified that it occurred on June 14, which was five days before Day allegedly brandished the firearm, id. at 70.

[7]Officer Koester can be overheard on body camera footage telling Day they were going to search his apartment to make sure no one was hurt inside and that police can do a safety sweep if they were going to write a search warrant to ensure there was no one in the apartment ruining evidence. Gov. Ex. 1 at 15:52–16:12. Although Day notes these statements in his objections, Doc. 38 at 6, Officer Koester's "subjective considerations" are "immaterial" to whether the officers had reasonable suspicion to conduct a protective sweep. United States v. Pile, 820 F.3d 314, 316–17 (8th Cir. 2016) (per curiam).

apartment, Officer Koester told them that Day said they could retrieve the toy cap gun underneath his bed. Gov. Ex 1 at 19:17–50. Day told the officers where the toy gun was and said that he had two machetes in the apartment but no other guns. Id. at 19:17–50.

The officers reentered Day's apartment and seized the toy gun and a pair of blue jeans they saw in plain view. Doc. 29 at 65–67; Gov. Ex. 2 at 26:00–29:00. The toy gun was not a black, snub-nosed revolver like the reporting party and his girlfriend described, but the blue jeans were consistent with what these witnesses said Day was wearing when he brandished the gun. Doc. 29 at 66–68.

Once the officers finished retrieving the toy gun and jeans, Officer Koester asked Day for permission to search the apartment. Gov. Ex. 1 at 23:35–24:05; Gov. Ex. 2 at 29:55–30:20. They had the following exchange:

> Officer Koester: Can they search your apartment?
> Day: (inaudible)
> Officer Koester: They want to look for any evidence of a crime, so if you're innocent and there's no evidence in there obviously it's gonna help your, your case, right? If they find evidence of the crime then—
> Day: I just woke up, man.
> Officer Koester: Okay. Can they—can they just go through and make sure there's nothing that would link you to what happened today?
> Day: I would rather be there.
> Officer Koester: You would rather be there? Okay. Well, we can't just have you just sitting in there watching, so. You can—you can stop this—you can tell—you can say
> Day: Did you find the, um, uh, uh, the cap gun?
> Officer Koester: Yeah, we did.
> Day: Okay, then that's it. And the machetes are on the opposite side of my bed.
> Officer Koester: Okay. Can we just double check? Like trust but verify, right? Like I don't know you. I don't know if what you're telling me is correct, right?
> Day: I don't want people just creeping around my crib.
> Officer Koester: Okay. So that's a no?
> Day: I really would, would rather not.

Officer Koester: Okay.

Gov. Ex. 1 at 23:55–24:55. Immediately after this exchange, Day overheard Sergeant Fox in the

hallway telling officers to secure the apartment and items they had seized. Gov. Ex. 2 at 31:05–

25; Gov. Ex. 1 at 24:50–57; Doc. 29 at 34–35. This prompted further discussion:

> Day: Whoa, whoa. Wait, wait, wait. Hold on. What did he say?
> Officer Koester: We're going to call a detective so they can write a search warrant so we can search your entire apartment. Is there anything we're gonna find in there?
> Day: Nah.

Gov. Ex. 1 at 24:55–25:10. When Sergeant Fox told the officers to move Day to a patrol car, Day,

unprompted, said:

> Day: Go ahead and search.
> Officer Koester: Let's do it.
> Day: (inaudible) What'd he say?
> Officer Koester: You want us to search it?
> Day: I mean, if you're going to uh, just make a mockery of it, might as well.

Id. at 25:09–25; Gov. Ex. 2 at 31:27–31:34.

Officer Koester told Sergeant Fox that Day was changing his mind about the search, and

Day and Officer Koester then continued to discuss Day's consent:

> Officer Koester: So he can search—we can search your apartment for any evidence?
> Day: Man, I don't—I don't—I would rather be—
> Officer Koester: It's a yes or no, right? You just said go ahead and search and now you're—
> Day: I mean, yeah, go ahead.
> Officer Koester: Go ahead? Go ahead and what?
> Day: Yes.
> Officer Koester: We can search your apartment?
> Day: Yes.
> Officer Koester: Okay.
> Day: Uh, I really don't want—
> Officer Koester: Just so you—hey—you can refuse consent at any time. So if you want to stop the search you can just let me know, okay?

6

> Day: I really don't want to be wearing these (referring to handcuffs). (Inaudible).
> Officer Koester: I know, but—but you're being detained right now. I can't take them off right now, okay?
> Day: I mean, no, I'm not saying—
> Officer Koester: The allegations—
> Day: The process. The process, if it's quick, then fine.
> Officer Koester: Okay. Yeah. You can revoke the consent at any time. So if—
> Day: I don't wanna revoke, I want to get out of these handcuffs.
> Officer Koester: Okay, I gotcha.

Gov. Ex. 1 at 25:25–26:15.[8]

The officers searched Day's apartment and found some "methamphetamine-related paraphernalia" and a black revolver in the ceiling tiles of the bathroom. Gov. Ex. 2 at 41:00–42:02; Doc. 29 at 36, 71. The revolver matched the description given by the reporting party and his girlfriend. Doc. 29 at 36–37, 71. A federal grand jury charged Day with possession of a firearm by a prohibited person. Doc. 1.

## II.    Analysis

### A.  Standard for Reviewing Report and Recommendation

This Court reviews a report and recommendation under the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." However, "[i]n the absence of an objection, the district court is not required 'to give any more consideration to the magistrate's report than the court considers appropriate.'" United States v. Murillo-Figueroa, 862 F. Supp. 2d 863, 866 (N.D. Iowa 2012) (quoting Thomas v. Arn, 474 U.S. 140, 150 (1985)).

---

[8]Body camera footage from Sergeant Fox shows that the police entered Day's apartment for the consent search right after Day said "Yes" the first time, and just before Officer Koester said Day could refuse consent at any time. See Gov. Ex. 2 at 31:42–32:10; Gov. Ex. 1 at 25:30–26:15.

The magistrate judge recommended denying the motion to suppress, finding that the protective sweep exception to the warrant requirement applied to the first search of Day's apartment, that Day voluntarily consented to the second search for the limited purpose of retrieving the toy gun,[9] and that Day voluntarily consented to the third search during which officers recovered the black revolver. Doc. 30 at 9–20. Day objected, arguing that the officers lacked reasonable suspicion to conduct a protective sweep and that his consent to the third search was involuntary. Doc. 38. Day did not object to the magistrate judge's finding that the second search was constitutional, however. Doc. 38 at 11–12.

This Court issued an opinion expressing skepticism about whether the protective sweep was legal and setting oral argument on whether an exception to the exclusionary rule might apply here. Docs. 40, 41. The Government maintained at oral argument that the evidence seized from Day's apartment is admissible under the attenuation doctrine even if the protective sweep was illegal. Day argued otherwise. This opinion includes the prior discussion on the protective sweep but also analyzes the attenuation doctrine.

**B. Protective Sweep**

The Supreme Court in Maryland v. Buie, 494 U.S. 325, 327 (1990), established that police officers may conduct a "protective sweep" of a home while making an arrest without violating the Fourth Amendment. "A 'protective sweep,'" Buie explains, "is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Id. These protective sweeps are justified, however, only when police "possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those

---

[9]The magistrate judge noted that Day was unclear about whether he was arguing that his consent to the second search was involuntary. Doc. 30 at 14.

facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." Id. (cleaned up and internal citations omitted). Police thus must have reasonable suspicion that a dangerous individual is inside the residence and cannot perform protective sweeps just "for weapons or contraband." United States v. Alatorre, 863 F.3d 810, 813 (8th Cir. 2017) (citation omitted). Because the arrest of a suspect doesn't always remove the threat from other individuals potentially in the home, the Eighth Circuit and other federal appellate courts have upheld protective sweeps of a residence even after an arrest is made outside the residence. Id. at 814–15 (finding reasonable protective sweep of home conducted after officers had arrested suspect at his front door and secured him on his porch).

The Government here has not met its burden to show that the police had reasonable suspicion to believe a dangerous individual was in Day's apartment. It is true that the officers' plan to hold Day's apartment until they could secure a warrant could make them more vulnerable to an attack from inside than if they had merely arrested Day and immediately transported him to jail. See id. at 815 (noting that officers dealing with arrested suspect and his girlfriend on front porch remained "vulnerable to attack from someone inside the residence"). But the police knew that Day was alone when he allegedly brandished the firearm at the reporting party and his girlfriend. The police had no information that anyone else lived with Day and heard nothing from within the apartment to suggest someone was there. There were no windows from the apartment to the hallway, making some sudden attack from within the apartment highly unlikely. Before the protective sweep, the officers lingered outside of the apartment casually without any indication of concern for their safety from within the apartment.

The officers had a reasonable belief that there was a gun inside Day's apartment, knew from the BOLO that Day and an accomplice had allegedly robbed someone five days earlier, and

9

said they were concerned that Day's delay in answering the door might have allowed an accomplice to hide. These factors tend to support the officers' decision to conduct a protective sweep. See United States v. Thompson, 6 F.4th 789, 793 (8th Cir. 2021) (finding that the potential presence of guns in the house anyone remaining inside could use against the police supported officers' decision to perform protective sweep); Alatorre, 863 F.3d at 815 (citing to delay in answering the door, along with the "audible movements and behaviors" of those inside the home); United States v. Davis, 471 F.3d 938, 945 (8th Cir. 2006) (stressing—along with multiple other facts showing reasonable suspicion—that suspect "associated with dangerous and violent persons"); United States v. Brown, 217 F.3d 605, 607–08 (8th Cir. 2000) (upholding protective sweep of house where suspect paused when asked whether anyone else was in the house and officers knew that suspect and his roommate had been arrested five months earlier with two guns).

But the police in cases where the Eighth Circuit has upheld protective sweeps had more articulable facts suggesting someone else was inside the residence than the officers had here. In Alatorre, for instance, the officers overheard quiet conversations coming from the house and heard and saw movements in the house consistent with multiple people being inside. 863 F.3d at 812, 814–15. Similarly, the officers in Thompson waited six to eight minutes for someone to answer the door, saw window blinds move and heard people walking and moving things inside, and could not locate the woman to whom they believed the house belonged. 6 F.4th at 791, 793. They also received an "odd, ambiguous answer" when they asked whether anyone else was in the house. Id. at 793. Likewise, in Brown, the police knew that the suspect and his roommate had been arrested five months earlier in a vehicle where two guns were found and the suspect paused before answering whether anyone else was in his home. 217 F.3d at 607. The officers at Day's apartment did not report any facts like those Alatorre, Thompson, or Brown. Rather, Officer Koester testified

10

that he did not hear any noise coming from Day's apartment, Doc. 29 at 46, and Sergeant Fox similarly denied hearing any "disturbance" therein, id. at 87. The Government also presented no evidence suggesting that Day's alleged accomplice from five days previously mentioned in the BOLO would be inside the apartment. Both the reporting party and his girlfriend gave an account that Day was alone when he allegedly brandished the firearm. The mere possibility someone else is inside a residence is not enough to justify a protective sweep. United States v. Carter, 360 F.3d 1235, 1242–43 (10th Cir. 2004).

### C. Exclusionary Rule and the Attenuation Doctrine

This Court explained in its prior order that its skepticism about the protective sweep doesn't necessarily mean the gun found in Day's apartment must be suppressed. The exclusionary rule is the "principal judicial remedy" for Fourth Amendment violations. Utah v. Strieff, 579 U.S. 232, 237 (2016). It requires courts to exclude evidence seized "as a direct result of an illegal search" as well as "the fruit of the poisonous tree," meaning evidence discovered later but derived from an illegal search. Id. (cleaned up and citation omitted). The exclusionary rule "is not an individual right," however, and does not apply to every Fourth Amendment violation. Herring v. United States, 555 U.S. 135, 141 (2009). Rather, the impetus for the rule—at least for the last sixty years or so—has been to deter future police misconduct. United States v. Calandra, 414 U.S. 338, 347–48 (1974); Herring, 555 U.S. at 140–41. The exclusionary rule is thus limited to cases where it results in "appreciable deterrence," Arizona v. Evans, 514 U.S. 1, 11 (1995) (citation omitted), and where these deterrent benefits outweigh the rule's "substantial social costs," Strieff, 579 U.S. at 237 (citation omitted).

The Supreme Court has recognized several situations where the exclusionary rule's deterrent benefits do not outweigh its costs, the relevant situation here being the "attenuation

doctrine." Strieff, 579 U.S. at 237–38. Evidence is admissible under the attenuation doctrine when the causal "connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." Id. at 238. A suspect's consent to search can break the causal chain between the original illegality and discovery of the evidence. United States v. Whisenton, 765 F.3d 938, 941 (8th Cir. 2014). "When an illegal entry precedes a defendant's grant of consent to search, the Government must show (1) that the defendant's consent was voluntary and (2) that the consent was an independent act of the defendant's free will that purged the taint of the Fourth Amendment violation." Id. (cleaned up and citation omitted).

Voluntariness is factual question dependent on the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 248–49 (1973). Relevant factors include the defendant's characteristics—age, intelligence, experience with the legal system—and the circumstances of the situation, such as whether the police told him he could refuse consent, whether he was in custody or under arrest, whether the police threatened or made misrepresentations to the defendant, and whether the defendant was in a public or secluded place. United States v. Perry, 437 F.3d 782, 785 (8th Cir. 2006); United States v. Harris, 55 F.4th 575, 581 (8th Cir. 2022). The Government must prove consent by a preponderance of the evidence. United States v. Comstock, 531 F.3d 667, 676 (8th Cir. 2008).

This Court agrees with the magistrate judge that the Government has shown voluntary consent. Day was sixty years old when the search occurred and had extensive experience with the legal system, having been arrested over seventy times and been convicted of eighteen felonies.[10] Doc. 6 at 2–17; Doc. 29 at 98–99. He appeared to be of normal intelligence—responding

---

[10]When discussing the protective sweep with Officer Koester, Day said he'd "been in sweeps before." Gov. Ex. 1 at 16:00–16:20.

appropriately to the officers' questions—and did not seem to be under the influence of drugs or alcohol.[11] The officers did not threaten or try to intimidate Day, and Officer Koester did what he could to make Day comfortable, loosening Day's handcuffs and wiping sweat off his face. Gov. Ex 1 at 12:25–13:17; id. at 17:55–18:25. Beyond that, Day's detention before he consented was not lengthy (about 17 minutes), and he never revoked his consent even though Officer Koester said he could do so at any time. Def. Ex. B, Hagberg Clip 1 (showing that Day was detained at 6:50 p.m.); Gov. Ex. 1 at 25:09–25:55 (showing that Day consented to the search around 7:07 p.m.); see United States v. Becker, 333 F.3d 858, 861 (8th Cir. 2003) (holding that a thirty-minute detention before the defendant consented to the challenged search was "brief").

There are, of course, some factors that favor finding Day's consent involuntary: (1) Day was handcuffed and under arrest; (2) there were up to seven armed officers on the second floor of his apartment building; (3) the officers had not Mirandized him; (4) the apartment stairwell was a semi-secluded place; and (5) Day had previously declined consent to search twice. Day also argues that the officers' failure to tell him he was under arrest led him to believe that he would be released if he cooperated and consented to the search. He points out that he did not consent until after the officers entered his apartment without his consent for the protective sweep, after they discussed holding the apartment and taking him to a patrol car, and after they said they planned to get a warrant for his apartment.

---

[11]Day objects to the magistrate judge's finding that he wasn't under the influence of drugs or alcohol and did not have a mental disability. See Doc. 30 at 18. Earlier in the opinion, however, the magistrate judge wrote that Day had not alleged that he was under the influence of drugs or alcohol or that he has a mental disability. Id. at 17. Day agrees that he offered no evidence on these issues but notes that officers found methamphetamine paraphernalia in his apartment. Doc. 38 at 14. This Court has viewed the body camera footage multiple times and did not see any indication that Day was intoxicated or had a mental disability.

But the Eighth Circuit has found consent voluntary in circumstances more coercive than those here. See United States v. Magallon, 984 F.3d 1263, 1281–82 (8th Cir. 2021). The Eighth Circuit in Magallon upheld a finding that the suspect voluntarily consented to a search of his vehicle even though he had been handcuffed and detained in the back of a locked patrol car for over an hour before consenting, the police had asked for consent three times before the suspect agreed, the suspect had no arrest record, and the police had neither Mirandized him nor explained that he could refuse consent. Id. And the Eighth Circuit in Comstock found consent voluntary even though the officers told the defendant—who had already been sitting in handcuffs for two hours—that they would get a warrant if he refused consent and he would remain handcuffed for an additional two hours. 531 F.3d at 677–78; see also United States v. Adams, 346 F.3d 1165, 1171 (8th Cir. 2003) (explaining that it is "not per se coercive" to obtain consent to search after officers said consent "could make it easy" and "obviat[e] the need for the search warrant"). Though Day argues otherwise, the officers did not appear to be trying to coerce him into consenting by allowing him to overhear that they planned to hold the apartment and seek a warrant. Sergeant Fox started to leave the apartment to seek a warrant after Day refused consent, Gov. Ex. 2 at 31:05–47; Doc. 29 at 68–71, 93–94, and Officer Koester mentioned the warrant after Day reinitiated their conversation by asking what Sergeant Fox had said, Gov. Ex. 1 at 24:50–25:10. Under the totality of the circumstances, the facts supporting a finding that Day voluntarily consented outweigh those suggesting otherwise.

This Court considers three factors to determine whether Day's voluntary consent purged the taint of the unwarranted protective sweep: "(1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening

14

circumstances; and (3) the purpose and flagrancy of the agents' Fourth Amendment violation." Harris, 55 F.4th at 581 (cleaned up and citation omitted).

The temporal proximity factor is largely neutral. Courts measure temporal proximity "from the point at which the agents' conduct became illegal to the time of the consent. The closer in time the illegal entry and the defendant's consent occurred, the more likely the illegal entry influenced the consent." Id. at 582 (cleaned up and citation omitted). About nine minutes elapsed between the officers entering Day's apartment for the protective sweep and Day consenting to the search. Gov. Ex. 1 at 25:12; Gov. Ex. 2 at 22:20. Nine minutes is just on the cusp of when the Eighth Circuit has found that temporal proximity favors the Government. See United States v. Barnum, 564 F.3d 964, 972 (8th Cir. 2009) (saying that the court in United States v. Palacios-Suarez, 149 F.3d 770, 773 (8th Cir. 1998) found that "a nine-minute period between the start of the violation and the consent suggested that the taint was purged"); United States v. Esquivel, 507 F.3d 1154, 1160 (8th Cir. 2007) (finding the defendant's consent purged the taint of an Fourth Amendment violation when nine to ten minutes elapsed between "the time from which the stop became illegal to the time of the consent"); United States v. Herrera-Gonzalez, 474 F.3d 1105, 1112 (8th Cir. 2007) ("While 10 minutes does not in itself suggest sufficient attenuation to purge the taint of the stop, neither does it compel the conclusion that the attenuation was insufficient.").

The second factor—intervening circumstances—favors the Government. "[A]n intervening circumstance between the Fourth Amendment violation and the defendant's consent indicates that the consent was made of the defendant's free will and that the officer was not attempting to exploit an illegal situation." Barnum, 564 F.3d at 972 (cleaned up and citation omitted). There were several intervening circumstances here. Day sat on the steps and talked with Officer Koester after the officers began the protective sweep. Gov. Ex. 1 at 16:05–17:16. Officer

15

Koester wiped sweat off Day's face, and Day brought up the toy cap gun and consented to the officers entering the apartment a second time to retrieve it. Id. at 16:05–19:50. In discussing consent to a more extensive search, Day wanted to negotiate being present for the search. Officer Koester informed Day that he could not be present but could revoke his consent and stop the search at any time. Id. at 25:25–26:15. Day ultimately consented to the officers entering the apartment for a third time to search and told Officer Koester that he did not want to revoke consent. Id. These events gave Day a chance to reflect on his options and support a finding that the officers were not trying to exploit the earlier illegal protective sweep.[12] See Whisenton, 765 F.3d at 942 ("The presence of intervening circumstances that provide the defendant an opportunity to pause and reflect, to decline consent, or to revoke consent, help demonstrate that the illegality was attenuated." (cleaned up and citation omitted)); United States v. Moreno, 280 F.3d 898, 901 (8th Cir. 2002) (holding that trooper telling defendant he had the right to refuse consent indicated that he "was not attempting to exploit an illegal situation").

The last and most important factor—the purpose and flagrancy of the officers' Fourth Amendment violation—also favors the Government. See United States v. Greer, 607 F.3d 559, 564 (8th Cir. 2010) (noting that the Supreme Court has "placed particular emphasis" on this factor (cleaned up and citation omitted)). "Courts have found purposeful and flagrant conduct where (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his

---

[12]As noted above, body camera footage from Sergeant Fox shows that the police entered Day's apartment for the consent search right after Day said "Yes" the first time, and just before Officer Koester said Day could refuse consent at any time. See Gov. Ex. 2 at 31:42–32:10; Gov. Ex. 1 at 25:30–26:15. Officer Koester's statement about refusing consent is still relevant because the officers had just started the search and Day never revoked consent. See Whisenton, 765 F.3d at 942 (finding that the officers reading the defendant his Miranda rights and allowing him to speak with his mother after he had provided consent to search were still "meaningful" because the defendant "never attempted to revoke consent after these events occurred").

16

conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." Herrera-Gonzalez, 474 F.3d at 1113 (cleaned up and citation omitted). The protective sweep falls far short of the level of flagrancy needed to warrant suppression. Though the officers debated whether they could conduct a protective sweep under the circumstances and lacked reasonable suspicion, it was a close enough call that the magistrate judge recommended finding the protective sweep lawful. The officers had a reasonable belief that there was a gun in Day's apartment and expressed concern that someone still inside could use the gun to attack those holding the apartment for a warrant. Doc. 29 at 63–64, 88–89, 95–96. "Protection of officers conducting an arrest near a defendant's home is a priority recognized by our courts." Alatorre, 863 F.3d at 814. The officers' decision to conduct the protective sweep wasn't flagrant. See Strieff, 579 U.S. at 243 ("For the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure.").

Nor was the protective sweep investigatory in design or purpose. Although one of the officers performing the sweep mentioned watching for a black, snub-nosed revolver, the way the officers conducted the sweep—confining the sweep to areas where someone could be hiding and proceeding cautiously, with guns drawn, while calling out repeatedly for anyone inside to make themselves known—indicates that the officers were mainly concerned with their safety and clearing the residence. Gov. Ex. 2 at 22:20–25:25. The officers did not even notice the cap gun located on the floor beside the bed next to a nightstand. And this was not a situation where the officers discovered incriminating evidence during an illegal search and used that evidence to convince Day to consent. Indeed, the officers did not seize any evidence at all during the protective

17

sweep. Day's later voluntary consent to the search of his apartment was sufficient to purge the taint of the officers' unwarranted protective sweep.

### III.    Conclusion

For the reasons stated above, it is

ORDERED that the Report and Recommendation, Doc. 30, is adopted in part and only to the extent consistent with this Opinion and Order. It is further

ORDERED that Day's First Motion to Suppress Evidence, Doc. 21, is denied.

DATED this 2nd day of April, 2026.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

18